UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

KIARA FERNANDEZ-BRAVO and
BARKFUL, LLC,

        Plaintiffs,

v.

TARGET CORPORATION and TARGET
BRANDS, INC.,

        Defendants.

Case No. 25-CV-2241 (PJS/ECW)

ORDER

---

Melissa Rose McClammy and Joseph M. Pastore, III, PASTORE LLC; Emeric J. Dwyer and Harrison E. Berg, CHESTNUT CAMBRONNE, PA, for plaintiffs.

Doowon R. Chung and James R. Steffen, FAEGRE DRINKER BIDDLE & REATH LLP, for defendants.

Plaintiffs Kiara Fernandez-Bravo and Barkful, LLC (collectively "Barkful") owned a registered trademark—now canceled—for the name "Barkful" for goods and services in connection with the sale of dog food. Barkful brings this action against defendants Target Corporation and Target Brands, Inc. (collectively "Target"), asserting trademark infringement, fraud, and related claims.

This matter is before the Court on Target's motion to dismiss some of the claims in Barkful's second amended complaint ("SAC"). For the reasons that follow, the motion is granted, and the Court dismisses Counts 1, 4–5, and 7–9 of the SAC.

## I.  BACKGROUND

### *A.  Barkful*

Fernandez-Bravo founded Barkful in 2017.  SAC ¶ 20.  Barkful sells dog food at farmers markets in and around the Atlanta, Georgia, area and through its website and the websites of third parties.  SAC ¶ 22.  Barkful has been shipping products nationwide since as early as 2021.  SAC ¶ 22.  Barkful once owned United States Trademark Reg. No. 5518546, which covered the mark "Barkful" for goods and services related to dog food.  SAC ¶ 25.

Barkful's packaging has changed several times over the years.  In 2020, Barkful packaged its treats in tan rectangular pouches affixed with a white label.  SAC ¶ 27. The label included "cartoon style sketches of silhouette drawings of dogs," a "Serif font for Barkful Mark," and a product description (e.g., "Chicken Tenders").  SAC ¶ 27.  The Barkful mark was in small black text at the top; the product description, the phrase "TREATS FOR DOGS," and the illustration were in "vivid colors, including greens and oranges."  SAC ¶ 27.  The product description was below the Barkful mark, and the illustration was at the bottom of the label.  SAC ¶ 27.  The packages also had a clear window through which the product could be seen.  SAC ¶ 27.

In 2021, Barkful switched to pouches whose entire front was clear, fully exposing the product inside the pouch.  SAC ¶ 28.  The Barkful mark remained at the top of the

label, and the bottom of each label included one of varying illustrated silhouettes of a dog. SAC ¶ 28. The labels continued to use vivid colors (including orange), but in different ways. In one example, the label itself was orange, some of the text was white (including the Barkful mark), and the remaining text and line drawing were black. SAC ¶ 28. In another example, the label appeared to be a neutral color and both the phrase "Chicken Tenders" and the illustration were orange, with the Barkful mark and most of the other text being black. SAC ¶ 28.

In 2022, the packaging changed to white labels with a much larger "Barkful" mark at the top in black text. SAC ¶ 29. The product description was below in much smaller letters. SAC ¶ 29. The dog illustrations were at the bottom in black. SAC ¶ 29. In one example, the product description was orange, and the remaining text was black. SAC ¶ 29. Two other examples displayed holiday packaging; all of the text was black, and the label was bordered with red stripes in one example and what may be either black or dark, muted green stripes in the other. SAC ¶ 29.

In the first half of 2023, Barkful changed its labels yet again. This time, the labels were colorful—pink and orange in the examples shown in the SAC—and the text and illustrations were all black, with the Barkful mark at the bottom of the label and the product description at the top. SAC ¶ 30. Finally, in November 2023, Barkful redesigned its packaging a final time. SAC ¶ 31. The front of the package is now in

opaque, contrasting colors that blend where they meet. SAC ¶ 31. The Barkful mark is in large white text at the top, accompanied by a circular design with text touting product features. SAC ¶ 31. In the bottom half, there is a clear window with a line drawing of a dog covering a portion of the window. SAC ¶ 31. The line drawings are in a contrasting color from the background. SAC ¶ 31.

### B. Target's "Forward Founders" Program and "Kindfull" Line

On May 11, 2021, Fernandez-Bravo applied for Target's "Forward Founders" program ("Program"). SAC ¶¶ 8, 40. The Program's stated purpose was "to help Black-owned suppliers scale their businesses to work with mass chains" and "equip historically under resourced founders to become the next wave of generational wealth building companies, by utilizing Target's privilege and scale to democratize access, education and resources." SAC ¶¶ 37–38. The Program also promised that applicants would "[k]eep 100% of what's yours." SAC ¶ 39. As part of her application, Fernandez-Bravo uploaded photos of Barkful products (including packaging), as well as the URL for the Barkful website. SAC ¶ 41.

On June 23, 2021, Target notified Fernandez-Bravo that Barkful had not been selected for the Program. SAC ¶ 42. Two months later, Target launched "Kindfull," a pet-food line that includes dog food and treats. SAC ¶ 43. Target has obtained several

trademarks for the Kindfull line, include Serial No. 90373475, which applies to goods and services for dog food and treats.  SAC ¶ 43.

Barkful alleges that the Kindfull brand name is confusingly similar to its Barkful mark, that the trade dress of both products is likewise similar, and that Target used the Program to gain access to and misappropriate Barkful's intellectual property.  SAC ¶¶ 44–47, 54.  Based on these allegations, Barkful brings nine causes of action.  Target moves to dismiss six of Barkful's claims: Count 1 (federal trademark infringement under 15 U.S.C. § 1114); Count 4 (federal trade-dress infringement under 15 U.S.C. § 1125(a)); Count 5 (common-law trade-dress infringement under Georgia law); Count 7 (fraud); Count 8 (deceptive trade practices under Ga. Code Ann. § 10-1-372); and Count 9 (deceptive trade practices under Minn. Stat. § 325D.44).

## II.  ANALYSIS

### A.  Standard of Review

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment.  Fed. R. Civ. P. 12(d).  But the court may consider public records and materials that are necessarily embraced by the complaint without converting the motion into one for summary judgment.  *See Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891, 903–04 (8th Cir. 2017); *Gillick v. Elliott*, 1 F.4th 608, 610 n.2 (8th Cir. 2021).  Here, Target has offered—and the Court has considered—public records of Target's registration of its "Kindfull" mark.  *See* Chung Decl. ¶¶ 3–4 & Exs. B–C [ECF No. 19].[1]

### B.  Count 1 (Trademark Infringement)

Barkful brings a claim for infringement under 15 U.S.C. § 1114, which imposes liability for infringement of a "registered mark" in a civil action brought by the "registrant."  Target moves to dismiss this claim, arguing that, because Barkful's mark was canceled before it brought this action, Barkful is not a "registrant," and therefore cannot recover under § 1114.  Barkful responds that, even after a registration is canceled, a trademark owner may bring a § 1114 claim for acts of infringement that occurred while the mark was registered.

---

[1]The Court has not considered any of the other documents attached to the declaration of Doowon Chung.

Courts are split on the question whether a trademark owner may maintain a § 1114 claim for infringement of a trademark whose registration was in effect at the time of the alleged infringement but lapsed before the claim was brought. *Compare ZipSleeve, LLC v. W. Marine, Inc.*, No. 3:14-CV-01754-SI, 2015 WL 2380990, at \*3 (D. Or. May 19, 2015) (holding that a trademark owner whose registration lapsed cannot bring a claim under § 1114, even for infringement that occurred while the mark was registered), *with B&B Hardware, Inc. v. Hargis Indus., Inc.*, No. 4:06CV01654 BSM, 2016 WL 3615833, at \*5 (E.D. Ark. May 16, 2016) (holding that the owner of a formerly registered trademark may maintain a § 1114 claim for infringement that occurred while the mark was registered).[2]  Although the Court was initially inclined to agree with Barkful's position, a review of the case law has persuaded the Court that Target is correct.

Generally speaking, registration of a trademark is not a grant of substantive rights. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) ("[F]ederal law does not create trademarks."); *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 118 (2d Cir. 1999) ("As a general matter, registration creates no substantive trademark rights

---

[2]The *B&B Hardware* case was litigated over many years and involved multiple appeals to the Eighth Circuit and one trip to the Supreme Court.  *B&B Hardware*, 2016 WL 3615833, at \*1.  Following the 2016 district-court decision that permitted B&B Hardware to maintain a § 1114 claim for a mark whose registration had lapsed, the district court ultimately entered judgment in Hargis's favor, and the parties appealed for the last time.  *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 912 F.3d 445, 450 (8th Cir. 2018).  But Hargis did not appeal the holding that B&B Hardware could maintain its § 1114 claim, *id.*, so the Eighth Circuit had no occasion to address the issue.

against infringement beyond the common law rights acquired through use of the

mark.").  Instead, registration confers certain procedural and evidentiary advantages

that assist the trademark owner in protecting its rights under the common law:

> Registration . . . serves as 'constructive notice of the
> registrant's claim of ownership' of the mark.  15 U.S.C.
> § 1072.  It also is 'prima facie evidence of the validity of the
> registered mark and of the registration of the mark, of the
> owner's ownership of the mark, and of the owner's exclusive
> right to use the registered mark in commerce on or in
> connection with the goods or services specified in the
> certificate.'  § 1057(b).  And once a mark has been registered
> for five years, it can become 'incontestable.'  §§ 1065, 1115(b).

*B & B Hardware, Inc.*, 575 U.S. at 142–43.

In a variety of contexts, courts and administrative tribunals have said that, once

registration lapses, those advantages disappear.  So, for example, a prior registration is

no guarantee that an application to re-register the same mark will succeed.  *See*

*Anderson, Clayton & Co. v. Krier*, 478 F.2d 1246, 1248 (C.C.P.A. 1973) ("[A]ppellee argues

that since he is seeking to reregister a mark, the earlier registration of which had been

lost by inadvertence, rather than trying to get an initial registration, it would be

inappropriate to deny his application to register.  We find no merit to this argument.");

*United Indus. Corp. v. OMS Invest., Inc.*, 2010 WL 4035138, at *3 (T.T.A.B. Sept. 30, 2010)

(non-precedential) ("Having allowed its original registration to expire, applicant is now

in much the same position it would have been had the prior registration never

issued[.]"); *In re Compania Tabacalera Santiaguense, S.A.*, 1999 WL 546830, at *3 (T.T.A.B. July 21, 1999) (non-precedential) (rejecting applicant's argument that prior registration created a presumption that its mark was registrable); *In re Hunter Publ'g Co.*, 204 U.S.P.Q. 957, at *6 (T.T.A.B. Aug. 30, 1979) ("As to applicant's prior registration of the mark in issue, it cannot be completely ignored, but, nevertheless, it has been cancelled. This destroys the Section 7(d) presumptions and makes the question of registrability 'a new ball game' which must be predicated on current thought."); *In re Grey Hosiery Mills*, 137 U.S.P.Q. 455, at *1–2 (T.T.A.B. Mar. 6, 1963) (affirming refusal to register mark whose previous registration was canceled); *J.P. Stevens & Co. v. Farbenfabriken Bayer Aktiengesellschaft*, 124 U.S.P.Q. 432, at *1 (T.T.A.B. Feb. 23, 1960) (explaining that a previous, expired registration was not competent evidence that an applicant to re-register a mark had priority over a competitor's claim to an allegedly similar mark).

Similarly, once a mark is no longer registered, the nationwide constructive notice of the registrant's ownership of the mark disappears, even as to competitors who wrongfully used the mark while it was registered. In *Action Temporary Services, Inc. v. Labor Force, Inc.*, 870 F.2d 1563 (Fed. Cir. 1989), Labor applied to re-register a mark whose registration had lapsed. *Id.* at 1564–65. Action, a competing applicant for the same mark, first began using the mark when it was originally registered to Labor. *Id.* Labor argued that Action was not a lawful concurrent user because Action had first

used the mark when it was registered to Labor. *Id.* at 1565. The Federal Circuit held that, because Labor's earlier registration had lapsed, Labor could not rely on the fact that, at the time Action first used the mark, it was deemed to have constructive notice of Labor's ownership. *Id.* at 1566 (explaining that "the constructive notice effects of Labor's federal registration prevented Action from being a lawful user only during the existence of that registration").

Whether a trademark owner may maintain a § 1114 claim based on a lapsed registration is a difficult question, and the Court acknowledges that the relevant cases do not clearly dictate a result. Indeed, cases on both sides of the divide have cited *Action* in support of their views. *Compare B&B Hardware, Inc.*, 2016 WL 3615833, at *5 (citing *Action* to find that a trademark owner may maintain a § 1114 claim on a lapsed registration), *with Spin Master, Ltd. v. Zobmondo Ent., LLC*, No. 06-CV-3459 ABC (PLAx), 2012 WL 8134013, at *6 (C.D. Cal. June 18, 2012) (citing *Action* to find that a trademark owner may *not* maintain a § 1114 claim based on a lapsed registration).

Nevertheless, the general thrust of these cases is that, once registration lapses, the former registrant cannot derive any advantage from the fact that the registration once existed. The Court therefore agrees with those cases finding that, following the lapse of registration, trademark owners cannot rely on the presumptions attendant on registration, even when the registration was in effect at the time of the alleged

infringement.  *See Now-Casting Econ., Ltd. v. Econ. Alchemy LLC*, No. 23-947, 2024 WL 2720235, at *2 (2d Cir. May 28, 2024) (holding that a trademark owner could not rely on a registration that was canceled while the lawsuit was pending); *Spin Master, Ltd.*, 2012 WL 8134013, at *6 (same).  Further, because the very purpose of registration is to provide procedural protections, the absence of those protections means (as *ZipSleeve* found) that Congress did not intend a trademark owner without a currently existing registration to be able to bring a claim under § 1114.  *ZipSleeve, LLC*, 2015 WL 2380990, at *3 ("The weight of authority thus clearly indicates that Congress sought to protect only the interests of plaintiffs with *registered* trademarks under § 1114.  Plaintiffs with unregistered trademarks are protected by § 1125(a), but do not fall within the zone of interests protected by § 1114.").

The Court therefore grants Target's motion to dismiss Count 1 of the SAC.

### C.  *Counts 4 and 5 (Trade Dress)*

Target next moves to dismiss Counts 4 and 5, which allege infringement of Barkful's trade dress under 15 U.S.C. § 1125(a) and Georgia law, respectively.  Because neither side contends that there is any distinction between federal and state law, the Court will confine its analysis to § 1125(a).

"Trade dress typically refers to a product's design or packaging."  *Pocket Plus, LLC v. Pike Brands, LLC*, 53 F.4th 425, 432 (8th Cir. 2022).  "Trade dress is the total image

of a product, the overall impression created, not the individual features."  *Gateway, Inc.*

*v. Companion Prods., Inc.*, 384 F.3d 503, 507 (8th Cir. 2004) (citation omitted).  "[T]o

establish a claim for trade dress infringement, [a plaintiff] must demonstrate that its

trade dress is: (1) inherently distinctive or acquired distinctiveness through secondary

meaning; (2) nonfunctional; and (3) its imitation would result in a likelihood of

confusion in consumers' minds as to the source of the product."  *Id.*

Target argues that Barkful has failed to adequately allege either that its trade

dress is inherently distinctive or that its trade dress has acquired secondary meaning.

To be inherently distinctive, "a trade dress must be arbitrary, fanciful or suggestive."

*Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 n.7 (8th Cir. 1998).  Trade

dress is "arbitrary" when "a common mark is applied in an unfamiliar way as a

trademark or trade dress."  *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 672 n.10

(8th Cir. 1996).  "Fanciful" refers to marks "invented solely for their use as trademarks

or trade dress."  *Id.*  Finally, "suggestive" refers to a mark "that requires some measure

of imagination to reach a conclusion regarding the nature of the product."  *Id.* at 672

n.11 (citation omitted).  "[A] determination of inherent distinctiveness turns on whether

or not the trade dress is of such a design that a buyer will immediately rely on it to

differentiate the product from those of competing manufacturers."  *Id.* at 673 (citation

and quotation marks omitted).

Barkful identifies its trade dress as consisting of the combination of vivid colors, the Barkful mark in a serif font at the top of the label with the product description in the same serif font below, and the "unique to the brand" illustrations of the dogs at the bottom of the label.  SAC ¶ 36.  The Court agrees with Target, however, that Barkful fails to plausibly allege that its use of vivid colors, a serif font, and illustrations of dogs, in the specified (or any other) configuration, is inherently distinctive.  Barkful asserts the bare legal conclusion that these elements are distinctive, but does not allege any facts showing that any of these elements—vivid colors, a serif font, or illustrations of dogs—are unusual in the dog-food market (either alone or in combination).  *See Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994) (holding that a "commonplace" feature was "not entitled to registration absent a showing of secondary meaning"); *Critical Response Grp., Inc. v. Geo-Comm, Inc.*, No. 4:22-CV-00342-SHL-SBJ, 2023 WL 2442670, at *14 (S.D. Iowa Feb. 6, 2023) (finding no inherent distinctiveness where the "trade dress consists of a combination of design choices, color choices, and commonplace features that would be found on virtually any map").

Moreover, Barkful's packaging has not used these elements in a consistent manner.  For example, Barkful does not lay claim to a particular color in its trade dress, but rather to the entire category of "vivid colors."  The problem is that Barkful has used a variety of vivid colors in a variety of ways, including for the label's background, for

-13-

varying words in the label text, for some (but not all) of the dog illustrations, and, in the most recent iteration, for the overall package. All of this variation—that is, the many significant differences in Barkful's packaging over the past five years or so—makes it even less plausible that Barkful's use of these elements is inherently distinctive. *Cf. Gateway, Inc.*, 384 F.3d at 507 ("Trade dress is the total image of a product, the overall impression created, not the individual features." (citation omitted)).

Because Barkful has failed to plausibly allege inherent distinctiveness, Barkful must allege that its trade dress acquired secondary meaning. A mark acquires secondary meaning "when, in the minds of the public, the primary significance of [the] mark is to identify the source of the product rather than the product itself." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (cleaned up).

Barkful's first alleged use of its trade dress was in 2020. SAC ¶ 27. Target introduced the "Kindfull" line in August 2021. SAC ¶ 43. This timing alone makes it unlikely that Barkful's trade dress had acquired secondary meaning by the time Target began its allegedly infringing use. *See Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995) ("It is well settled that secondary meaning, or acquired distinctiveness, requires that the user of a trade dress show that by long and exclusive use in the sale of the user's goods, the dress has become so associated in the public mind with such goods that the dress serves to identify the source of the goods and to distinguish them from

those of others." (cleaned up)); *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) ("The user must also show that secondary meaning existed prior to the date on which the defendant commenced using the same or similar mark.").

Barkful alleges no facts that would make its facially implausible assertion of secondary meaning more plausible. Instead, Barkful conclusorily alleges that its trade dress acquired secondary meaning because the trade dress was extensively used in connection with Barkful's business. Barkful also incorrectly compares its 2023 trade dress to Target's Kindfull packaging, rather than the (markedly different) trade dress that existed when Target launched the Kindfull line in 2021.[3] SAC ¶¶ 35, 48; *Co-Rect Prods., Inc.*, 780 F.2d at 1330 (secondary meaning must exist before the defendant first used the mark). This is insufficient, particularly given that this is Barkful's third attempt to plead viable trade-dress claims. Target's motion to dismiss Counts 4 and 5 is granted.

---

[3]Barkful also alleges that, in 2025, some customers complained that they bought Barkful products at Target and their dogs did not like the food. SAC ¶ 55. Again, however, Barkful cannot rely on its current trade dress, which is markedly different from the trade dress used by Barkful when Target launched its Kindfull line in 2021. Barkful also alleges that even dogs can recognize Barkful's packaging. SAC ¶ 35. This does not help Barkful's attempt to establish secondary meaning, as a dog is unlikely to regard the trade dress as identifying "the source of the product rather than the product itself." *Wal–Mart Stores, Inc.*, 529 U.S. at 211 (citation omitted).

## D. *Counts 7, 8, and 9 (Fraud)*

Barkful brings claims of common-law fraud (Count 7), deceptive trade practices under Ga. Code Ann. § 10-1-372 (Count 8), and deceptive trade practices under Minn. Stat. § 325D.44 (Count 9). Counts 7 and 9 are explicitly based on Barkful's allegations that Target created the Program to allow it to steal applicants' intellectual property, and that, after getting access to Barkful's materials, Target copied Barkful's trademark.[4] SAC ¶¶ 129, 134, 136, 148–49. Count 8 seems to be implicitly based on the same allegations. In any event, Barkful's brief discusses the three claims together, so the Court will do likewise. *See* ECF No. 35 at 33–39.[5]

Target has submitted public records showing that it originally applied to register the Kindfull mark in 2020, months *before* Barkful submitted its application to the Program in May 2021. *See* Decl. ¶¶ 3–4 & Exs. B–C [ECF No. 19] (public trademark registration records showing that Target applied to register the Kindfull mark in 2020); SAC ¶ 8, 40 (Barkful applied to the Program on May 11, 2021). This timeline is fatal to Barkful's fraud claims, which, again, are premised on the allegation that Target

---

[4]Barkful also alleges that Target used the Program to steal Barkful's trade dress. The Court has already found that Barkful has failed to plausibly allege that its packaging—at least, the relevant 2021 packaging—constituted protectible trade dress.

[5]When citing documents by ECF number, the Court cites to the electronically generated page numbers at the top of the page.

fraudulently used the Program to gain access to, and copy, Barkful's intellectual property.  The Court therefore dismisses Counts 7, 8, and 9.

### E.  Request to Amend

Finally, Barkful asks for leave to file a third amended complaint in the event that the Court grants Target's motion to dismiss.  Barkful did not follow this District's local rules for seeking leave to amend, however, nor has it identified any additional facts that could save the dismissed claims.  Barkful's request for leave to amend is therefore denied.  *See O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 505 (8th Cir. 2009) ("A district court does not abuse its discretion in denying leave to amend where a plaintiff has not followed applicable procedural rules."); *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 914 (8th Cir. 2002) ("Meehan failed to specify the proposed new allegations, and the district court was not required to engage in a guessing game.").

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Defendants' motion [ECF No. 30] to partially dismiss plaintiffs' second amended complaint [ECF No. 24] is GRANTED.

2.   Counts 1, 4–5, and 7–9 of the second amended complaint are DISMISSED

WITH PREJUDICE.

3.   The stay [ECF No. 39] is LIFTED.  Defendants' answer to the remaining

claims in plaintiffs' second amended complaint is due on or before June

26, 2026.

Dated:  June 5, 2026                        /s/ Patrick J. Schiltz
                                            Patrick J. Schiltz, Chief Judge
                                            United States District Court